NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-799

STATE OF LOUISIANA

VERSUS

CHRISTOPHER TELL GLENN

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7781-04
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

OSWALD A. DECUIR
JUDGE

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Michael G. Sullivan, Judges.

AFFIRMED.

John F. DeRosier
District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for Appellee:
        State of Louisiana

Carla S. Sigler
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70602
(337) 437-3400
Counsel for Appellee:
        State of Louisiana

**Christopher A. Aberle**
**Louisiana Appellate Project**
**P.O. Box 8583**
**Mandeville, LA  70470-8583**
**(985) 871-4084**
**Counsel for Defendant/Appellant:**
      **Christopher Tell Glenn**

**Christopher Tell Glenn**
**In Proper Person**
**Avoyelles Correctional Center**
**1630 Prison Road**
**Cottonport, LA 71327**

**DECUIR, Judge.**

Defendant, Christopher Tell Glenn, was charged with second degree murder, in violation of La.R.S. 14:30.1. After a bench trial, the district court found Defendant guilty of manslaughter, in violation of La.R.S. 14:31. Defendant was sentenced to twenty-five years at hard labor with credit for time served, and the sentence was ordered to run consecutively to another sentence Defendant was serving as a result of a parole violation.

Defendant now appeals, arguing that the trial court erred in refusing to consider evidence that he offered to take a lie-detector test, and violated due process by basing the conviction on a mistaken recollection of fact.

Defendant also filed a *pro se* brief which contends that there was insufficient evidence presented at trial to support Defendant's conviction for manslaughter.

## FACTS

Early on the morning of February 8, 2004, an acquaintance of Defendant's, Christina Johnson, called him from right outside of his trailer. Ms. Johnson asked for $100.00 so that she could buy some crack cocaine. Defendant went inside with Ms. Johnson and gave her $20.00. Ms. Johnson left, telling Defendant that she would come back.

Ms. Johnson returned in a strange truck with David Regan. After arguing over the amount of drugs Defendant was willing to buy, Ms. Johnson and Regan drove off, taking Defendant's money and leaving no drugs.

After about five minutes, Defendant heard another car approach. Ms. Johnson, accompanied by another man, Bryan Myers, had returned to retrieve the cell phone she had left in Defendant's room. Defendant's statement indicated that he and Ms. Johnson returned to the trailer where Defendant found the phone and returned it to Ms. Johnson.

Defendant walked to the door of his home, and Ms. Johnson returned outside; at that point, Defendant, standing with the screen door open, threw a fit, again demanding to have his $20.00 returned to him. Defendant asserted that Mr. Myers charged through the open screen door and a fistfight ensued. Defendant thought that Mr. Myers might have been trying to rob him and, feeling that Mr. Myers was winning the fight, ran into the kitchen where he retrieved a knife from a drawer, and returned to where Mr. Myers was standing near the open front door.

Defendant stated that he intended to scare Mr. Myers and gave Mr. Myers a chance to leave. Defendant maintained that throughout the altercation, he had been yelling for help and telling Mr. Myers to leave. Defendant declared that Mr. Myers saw the knife and tackled Defendant anyway. Defendant thought that Mr. Myers was going to wrestle him to the floor, so Defendant, holding the knife in his right hand, stabbed down, striking Mr. Myers in the left side. Defendant said that he had intended to graze Mr. Myers; he felt that he may have missed Mr. Myers and simply snagged Mr. Myers' sweater.

Immediately after Defendant stabbed Mr. Myers, Defendant and Mr. Myers fell through the screen door, hit the aluminum stair railing, and rolled down the front steps of the trailer. Mr. Myers landed on top, but Defendant rolled him over and obtained the dominant position. At that time, Defendant's mother appeared from her bedroom and instructed Defendant to give her the knife. Defendant admitted that he did not know whether Mr. Myers had a weapon.

At trial, Ms. Johnson testified that, after the second visit with Defendant, she realized that she had forgotten her cell phone at Defendant's trailer. Ms. Johnson was irritated with Defendant, so she sent Mr. Myers to ask Defendant for her phone. Ms. Johnson stated that she did not remember much about what happened after Mr. Myers

2

left the car until she saw him fall. She ran to see what had happened, and, at first, Mr. Myers seemed fine.

Ms. Johnson went to the door and saw Defendant, his parents, and a knife. Ms. Johnson heard Defendant say that they had been trying to break into the house. Ms. Johnson responded by telling Defendant's mother, "no, ma'am, I was here to get my phone. After Defendant's mother asked Defendant about the "phone," someone handed Ms. Johnson her telephone. When Ms. Johnson turned around, she saw that Mr. Myers was struggling; he had moved from the grass to behind the steps as if he were trying to get to her. She went to him, noticed the blood, and noted that Mr. Myers seemed to be in shock.

Ms. Johnson averred that she had seen Mr. Myers approach the trailer, but she did not see him enter the domicile. Ms. Johnson was seated in her car where she would have been able to observe Mr. Myers enter Defendant's home. Ms. Johnson did not know why there would have been a confrontation because Defendant had no reason to be upset with Mr. Myers and because Mr. Myers was a passive and calm individual. Ms. Johnson did not hear or see a confrontation between Defendant and Mr. Myers and never heard Mr. Myers say anything threatening to Defendant. Ms. Johnson described Mr. Myers as short and of medium build and Defendant as being tall and thin.

At trial, the State also called Defendant's mother, Dorothy Sparks, to testify. Mrs. Sparks awoke when she heard someone talking loudly in the house. The loud voice increased in volume, becoming argumentative, and scuffling ensued. Mrs. Sparks climbed out of bed and ran to where she thought she heard the scuffling. Mrs. Sparks came upon Defendant and Mr. Myers after they had fallen down the front steps; Defendant was lying on his side, and Mr. Myers was climbing into a crouched

3

position. Mrs. Sparks told the men to stop their behavior, not initially realizing that Mr. Myers had been injured.

Mrs. Sparks became aware of Ms. Johnson standing next to the trailer, saying, "he's got my cell phone, he's got my cell phone." Mrs. Sparks asked Defendant if he had Ms. Johnson's cell phone, and Defendant denied possessing the telephone. As Mrs. Sparks turned to call 911, Defendant handed her a bloodstained steak knife and told her to take it. Mrs. Sparks put the knife in the kitchen sink. By the time Mrs. Sparks picked up the telephone to call 911, Mr. Myers had reached Ms. Johnson; Ms. Johnson began yelling that Mr. Myers had been stabbed.

Sergeant Timothy Deshotel, who took Defendant's initial statement, looked around the inside of Defendant's home and did not see anything that appeared to be blood; the first sign of blood was on the inside screen of the storm door. Detective Darek Ardoin also testified for the prosecution. During his assigned duty to safeguard the knife in the kitchen until it could be collected as evidence, Defendant's mother informed Detective Ardoin that she and her husband had been awakened by the loud commotion caused by the two men fighting outside and that she had taken the knife and put it inside. Detective Ardoin was also responsible for transporting Defendant from the scene to the Calcasieu Parish Sheriff's Office. During the trip, Defendant told Detective Ardoin, "I know the law and I know if it happened outside, there could be trouble, but it happened inside the trailer."

Corporal Henry White, who was a crime scene technician with the Calcasieu Parish Sheriff's Office at the time of the incident, testified that he had worked the February 8, 2004, crime scene. Blood spots were found on the front steps and the grass at the base of the steps, the inside of the aluminum stair railing, which would be on a person's left side as they entered the trailer, and the inside of the storm door

4

at the top of the steps. Bloodstain patterns were found on the concrete both between the trailer and a truck parked under the carport as well as on the opposite side of the truck from the trailer; additionally, blood smears appeared on the post supporting the carport, the truck, and in approximately the same area as the blood pattern on the outside trailer wall.

Debris left by the people administering emergency medical treatment shows that Defendant was treated at the blood pattern site located between the truck and the trailer wall. A bloody Smart Cook brand knife was found in the kitchen sink. Defendant had scrapes and abrasions on his knee, small scratches on his back, and an injury to one of his fingers on his right hand.

Gary Rogers, an assistant director of the Southwest Louisiana Crime Lab, investigated the living room area of Defendant's trailer. Mr. Rogers visually inspected the living room for blood evidence, swabbing and testing any stains or marks that could have been blood. None of the tests indicated the presence of blood in the living room.

## SUFFICIENCY OF THE EVIDENCE

Defendant, *pro se*, asserts that the trial court erred in denying Defendant's Motion for Post Verdict Judgment of Acquittal considering that there was insufficient evidence to support Defendant's conviction for manslaughter. Defendant alleges that the district court should have found that the homicide was justified because Mr. Myers was the aggressor in the situation.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v.*

5

*Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

MANSLAUGHTER:

Second degree murder occurs when an offender kills a human being with the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1(A)(1). "Manslaughter exists if a defendant can prove by a preponderance of the evidence that mitigating factors, such as provocation, exist." *State v. Paddio*, 02-722, p. 12 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1128-29, *writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682 (citing *State v. Baldwin*, 96-1660 (La. 12/12/97), 705 So.2d 1076, *cert. denied*, 525 U.S. 831, 119 S.Ct. 84 (1998)).

This court has held that specific intent to kill or inflict great bodily injury may be found when a wound is inflicted at close range. *State v. Reed*, 00-1537, p. 6 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391. Likewise, this court has found sufficient evidence to prove specific intent to kill or inflict great bodily harm when the evidence shows that the defendant fatally stabbed his victim in the back. *State v. White*, 544 So.2d 620 (La.App. 3 Cir. 1989), *writ denied*, 550 So.2d 648 (La.1992).

In *State v. McZeal*, 467 So.2d 142, 145 (La.App. 3 Cir. 1985), this court found sufficient evidence to sustain a manslaughter conviction arising from a second degree murder charge. McZeal argued with his stepson, which resulted in a scuffle. *Id*. During the struggle, McZeal fired one fatal shot from a .38 caliber revolver into his

6

stepson's head. *Id*. This court found that the jury could have found "that the offense was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive McZeal of his self-control and cool reflection [; therefore,] . . . any rational trier of fact could have found beyond a reasonable doubt that McZeal committed the crime of manslaughter." *Id*.

In his taped interview, Defendant admitted to deliberately stabbing down at Mr. Myers' exposed back and striking Mr. Myers in the left side. The testimony shows that the stab wound located on Mr. Myers' left back was the cause of his death. Defendant and his mother maintained that an argument as well as a physical fight took place. Ms. Johnson did not hear the verbal altercation but saw the physical scuffle and reported that she had seen Defendant strike the first blow. Therefore, the evidence of the crime is that (1) Mr. Myers was a human being, (2) Defendant and Mr. Myers fought, (3) testimony conflicted as to who was the aggressor, (4) Defendant intentionally stabbed Mr. Myers in his left side, (5) Defendant also stabbed at or lashed out at Mr. Myers with the knife at least three additional times, and (6) Mr. Myers died from a stab wound in his left back.

Thus, there was sufficient evidence presented at trial to prove that Defendant committed manslaughter.

JUSTIFICATION:

Defendant argues that there was sufficient evidence presented to show that Defendant was justified in killing Mr. Myers because Ms. Johnson planned on robbing Defendant, Mr. Myers had drugs and alcohol in his system, Mr. Myers was the aggressor in the incident, and the brawl started inside Defendant's home. Defendant does not contend that lethal force was necessary to repel Mr. Myers or protect the other occupants of the trailer; he also alleges neither that he had a

7

reasonable belief that Mr. Myers was likely to use unlawful force against any occupant of Defendant's dwelling nor that Mr. Myers was committing or attempting to burglarize or rob Defendant's home.

"When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense." *Paddio*, 832 So.2d at 1123. Justifiable homicide occurs:

> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

> (3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling . . . while committing or attempting to commit a burglary or robbery of such dwelling . . . . The homicide shall be justifiable even though the person does not retreat from the encounter.

> (4)(a) When committed by a person lawfully inside a dwelling . . . against a person who is attempting to make an unlawful entry into the dwelling . . . or who has made an unlawful entry into the dwelling . . . and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises . . . . The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter.

La.R.S. 14:20, in pertinent part.

The trial court found that Defendant employed excessive force. The record shows that Mr. Myers was smaller than Defendant; that Mr. Myers was garbed in jeans, a sweater, and a t-shirt; that Mr. Myers was unarmed; and that Mr. Myers at no point acted as if he were going to draw a weapon. Nothing in the record indicates that

8

Defendant thought his life or the life of another was in imminent danger or that he or another was in imminent danger of receiving great bodily harm. Moreover, nothing in the record shows that deadly force was required to prevent Mr. Myers from entering the trailer or to expel him from Defendant's home. Therefore, those portions of justification requiring that the defendant reasonably believe that deadly force was necessary do not apply.

Furthermore, La.R.S. 14:20(3), which does not require a reasonable belief that lethal force is necessary, is also inapplicable to the instant situation. The trial court found Defendant's claim that Mr. Myers had entered Defendant's home to be unbelievable. Instead, the trial court found that the struggle happened at the top of the front steps. Thus, Mr. Myers, in fighting with Defendant, did not actually employ or attempt to employ any unlawful force against a person in the dwelling. Also, at least one witness testified that Defendant struck the first blow. Also, the State presented evidence showing that Mr. Myers approached Defendant's dwelling with the sole intention to retrieve Ms. Johnson's cell phone, which negates any contention that Mr. Myers approached the trailer with the intention of burglary or robbery. Therefore, La.R.S. 14:20(3) is also inapplicable to the current case.

Thus, when the evidence is viewed in the light most favorable to the prosecution, the State presented sufficient evidence to negate Defendant's allegations of justification. This assignment of error is without merit.

### EVIDENCE

Defendant asks the following question:

A defendant has a state and federal constitutional right to present relevant evidence that substantially aids his defense. Mr. Glenn sought to introduce evidence that he offered to take a lie-detector test in support of his claim that he acted in self defense. As this evidence showed the lack of a guilty conscience, did the court err in refusing to consider this evidence?

9

Defendant asserts that the trial court's denial constituted reversible error and prays for a new trial based thereon.

Defendant alleges that, as shown in a videotaped interview, he offered three times to take a lie-detector test in support of his self-defense argument. When the defense attempted to present Defendant's willingness to take a lie-detector test and the police's refusal to administer one, the State objected on the grounds that lie-detector results were inadmissible. The defense responded that the prohibition did not extend to Defendant's willingness to take the test. The trial court sustained the prosecution's objection.

The Louisiana Supreme Court has held that a witness's or party's willingness or unwillingness to submit to a polygraph examination is inadmissible at trial, but has stated that the actual admission of evidence concerning lie-detector tests at trial will not be grounds for reversal unless the defendant has been prejudiced. *State v. Edwards*, 406 So.2d 1331 (La.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2011 (1982); *State v. Titus*, 358 So.2d 912 (La.1977); *State v. Davis*, 351 So.2d 771 (La.1977). The supreme court has affirmed a trial court's decision to prevent the admission of a witness's willingness or unwillingness to submit to a polygraph exam. *State v. Drew*, 360 So.2d 500, 520-21 (La.1978), *cert. denied*, 439 U.S. 1059, 99 S.Ct. 820 (1979).

Accordingly, the trial court did not abuse its discretion in excluding from evidence Defendant's willingness to undergo a lie-detector test. This assignment of error is without merit.

## RELIANCE ON MISTAKEN RECOLLECTION

Defendant argues that the district court violated his right to due process by expressly relying on a mistaken recollection of the evidence as a basis for rejecting

Defendant's self-defense claim. Defendant asserts that, at trial, Defendant did not contest any issue except whether he acted in self-defense. Defendant relies on the following statement by the trial court to support this assignment of error:

> The defendant had been looking out the window. He looked out the window at least three times. The first time was when Ms. Johnson pulled up by herself earlier in the morning. And then he looked out the window again when Mr. Regan pulled up in the black truck. And he looked out the window again when Johnson and Myers pulled up that third occasion. So he was keeping an eye out for who was coming and going. It was clear that he could see who was there and that there was no reason for him to believe that deadly force was necessary.

Defendant proposes that the trial court must have remembered the evidence incorrectly due to the trial being interrupted by Hurricane Rita. Defendant contends that the evidence does not show that he looked out of the window when the victim arrived at his home. Defendant alleges that the evidence shows that he specifically stated that he did not look out of the window on the third occasion..

Defendant points out that, constitutionally, under *Turner v. Louisiana*, 379 U.S. 466, 472, 85 S.Ct. 546, 549 (1965), a jury's verdict has to be based on the evidence developed at trial. Defendant reasons that the same concept should apply to bench trials and propounds that, therefore, a trial court should not be able to base its decision on a faulty recollection of the evidence. Defendant states no authority to support his theory that a single faulty recollection of fact invalidates a verdict.

The trial court issued the following statements in conjunction with its ruling:

> The evidence clearly showed that the victim was a smaller person, and there was no reason to believe that the victim was armed with any type of weapon, that the victim, Mr. Myers, had a T-shirt on with a thin sweater on over it, and Mr. Glenn, *the defendant, had been looking out the window. He looked out the window at least three times. The first time, I believe, was when Ms. Johnson, Christina Johnson pulled up by herself earlier in the morning, and then she looked out and he looked out the window again when the black truck with Mr. Regan pulled up, and he looked out the window again when Ms. Johnson and Mr. Myers pulled up on that third occasion. So he was keeping an eye out for who was coming and going, and it's clear that he could see who was there,*

11

*and that he, and that there was no reason for him to believe that deadly force would have been necessary* under the circumstances presented in this case.

(Emphasis depicts the section that is the basis of Defendant's complaint.) Thus, as indicated by Defendant, the trial court stated that Defendant looked out of his window three times.

Defendant supports his allegation by referencing his second video statement, which was given on March 11, 2004. In that video statement, Defendant recounted what he alleged to be facts. Ms. Johnson had told another person who, in turn, disclosed the information to Defendant. In that second statement, Defendant said that he had been relating the incident like he was peeping out the window, seeing it all and then says, "No." Contrary to Defendant's allegation, however, Defendant specifically stated in his initial statement to the sheriff's office on February 8, 2004, that about five minutes after Ms. Johnson left the second time, he heard a vehicle approach, and because it looked like Ms. Johnson's car, Defendant opened the front door. Thus, even if Defendant did not look out the window, he looked out of the trailer on the third occasion, and the result is the same.

This assignment of error is without merit.

**DECREE**

Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.

12